Mr. Justice James
delivered the opinion of the court.
In the consolidated cases of Thomas J. Fisher and others against Almerin H. Lighthall,. it appears from the record that Fisher & Co., acting as real estate agents are accustomed to do here, executed in their own name alease to the defendant Lighthall of a furnished house in this city at the rate of one hundred dollars a month for one year from the 10th of November, 1883.
It .also appears that the tenant occupied the premises several months, and then, claiming that they were in an uninhabitable condition, left them, and afterwards surrendered the keys to the landlord, that is handed them to him, although they were not accepted by way of surrender. The defendant paid the rent up to the time he left.
Suit was brought for the recovery of the rent for the remainder of the term. The defendant’s counsel offered to prove the house uninhabitable at the time of the demise by the following evidence:
“ To prove, by three competent witnesses that shortly before or about the 10th of November, 1883, the date of the renting, the house was well ventilated, had no fire, and appeared suitable for habitation; that the defects afterwards found were then latent; that shortly after, and as soon as the furnace and range in the house had been put in order, fires kindled, and the house heated, the premises became in *85 tolerable and unfit for human habitation from the sewer gas penetrating the house from the sewers, and .from the illuminating gas escaping from the gas pipes, and that one or more members of the defendant’s family were made ill, and continued ill during the whole time of defendant’s occupation of the premises, from the noxious gases and unhealthy condition of the house, made so by defective plumbing.”
He also offered to prove that the premises were' infested with ants from the basement to the garret, so that no articles of food could be protected from their depredations, and that these ants infested also the furniture in the house, by means of all which the house was unfit for human habitation.
The lease contains covenants on the part of the lessee that he will take the house and hold it for one year from the 10th of November, 1883, and that he will pay this rent and the gas bills and water rent bills, and that he will leave the premises in like good order in which he took them. It contains no express condition or reservation in. case the house proved to be unfit for habitation at the time he took it. He claims, however, that the law establishes a condition — not merely a covenant, but a condition — that if a house is let furnished (for he confines himself to that), and it is not in a habitable state, the lessee may throw up the lease and abandon the premises without liability to pay rent for the property.
We were referred to the case of Smith vs. Marrable, 11 Mees. & W., 5, decided by Lord Abinger, chief baron of the circuit, and afterwards adopted by the judges of the exchequer, where a house simply designated as house No. 5 Brunswick Place, London, was rented for a short period, being as a matter of fact a furnished house. Lord Abinger held, that the party could abandon the premises on finding that the beds were incurably infested with bedbugs — that is shown to have been the meaning of the language used by a subsequent case in which Lord Abinger .commented upon this one. He dwelt upon the dual character of the letting; *86 that it was not a letting of real estate simply nor substantially, but was a letting of a furnished house in which the furniture was one of the constituents demised. There was no specific description of the furniture to be let, and his lordship was of opinion that there was an undertaking that a furnished house should have appropriate furniture in it. That was all of the case. The objection of the lessee did not relate to any defect of the real property, but was wholly to the furniture, and the court thought that in such case there was an undertaking that suitable furniture should be substituted and if it were not the party could give up the lease.
The principles on which they undertake to establish this seem to be very shadowy, and they begin upon a very curious basis. Baron Park referred to two cases of this character, as showing that where premises held from year to year become untenantable, the courts sustain the tenant in his abandonment of the premises without notice to the landlord. That has no application to a case of a fixed tenancy for a specific term, for the law created that tenancy from year to year and upon equitable considerations.
Besting upon such grounds as that the exchequer sustained Lord Abinger in his conclusions that where house and furniture were let, and there appeared to be no specific designation of the particular furniture, there was an implied undertaking that appropriate furniture should be put into the house if such furniture was not there already, and if that condition was not complied with, then the whole letting should be thrown out.
That question came uji afterwards, in the case of Sutton vs. Temple, 12 Mees. & W., 52, and in the case of Horl vs. Windsor, in the same volume, page 68, and there it is perfectly apparent that the court cut the case down to the letting of a furnished house where there appeared to have been no specific descrijition of the furniture to be let, and where the defect had been in the furniture.
At a later period the question came up in relation to a defect in the premises of the real estate itself. The case is *87 that of Wilson vs. Finch-Hatton, 2d Law R., Ex. Div., 336. A lady, through an agent, had taken a furnished house in London to be held by her during what is known there as the season — three months. It proved, when she arrived, that the house had a bad smell. She refused to occupy it and went to other lodgings, and wrote to the landlord that the house was unfit for habitation. The landlord then undertook to put it into good condition, when it was discovered that there was a cess-pool under the pantry, and that under the kitchen floor there was a most frightful condition of filth that was covered up. Chief Baron Kelly was of opinion there, that where a house was let furnished for immediate occupation, under just such circumstances as I have described, there was an understanding that it should be habitable. After discussing certain principles, he said:
“I now proceed to consider whether both parties to this agreement intended that the house should be fit for occupation ; that is, that it should be reasonably healthy, and so not dangerous to the life of those inhabiting it. I think that it is quite manifest that they did so intend; and, indeed, one of the letters of the lady who intended to occupy the house (and she is practically the defendant), mentions the subject of drainage. Is it not, then, clear that the tenant is entitled to find the drains in such a condition that she and her family and her servants can safely enter and live in the house P However, on the contrary, when she entered, she found that there were strong and noisome odors in the house, and that there was under the rooms in the basement a deposit of filth and fcecal substance, which it was absolutely necessary to remove before the house could be safely occupied by anyone. Without doubt, a person who so enters under such an agreemen.t as this on furnished premises in the condition just described, may at once throw up the lease and decline to pay any rent under it. Can it be that the lessee would be bound to give notice of the defects in the house to the lessor, and then to procure another temporary residence, and wait there until the lessor had completed the alterations necessary to render the house healthy ? *88 I am of opinion that if such were the law of England it is time that it should be altered. But the law is not so,” he added.
That, then, is the only case cited to us in which a defect to the real property was held to be a ground on which the party could abandon the lease without paying the rent; in other words, the only case in which such a defect was held to be a condition to the letting.
In the other cases the court expressly disclaimed any intention to apply this rule to the letting of real property as a rule appropriate in such cases, and they applied it only on the ground that there was coupled with it a condition implied from this contract about the furniture.
The same question has come up in this country. The later English cases have declined to apply that doctrine, and the American cases have followed these later cases.
There is a very marked case in 9th Cushing, where the court quote from the Exchequer Court decision, and they express the opinion that under, such a condition of letting, the health of the premises, might not seem to be an unreasonable rule in such cases, yet it was not in the power of the court to establish such a rule; that parties are to be left to make their own contracts, and where they have done so the courts will not undertake, to introduce new terms into a written contract. We constantly insist upon that with regard to all other contracts where they are supposed to set-out the full intention of the parties, and certainly it is quite as reasonable to do it in respect to the letting of land where the contract is generally made with peculiar deliberation.
I have to remark that- although it might seem to be a reasonable condition, and if we had to establish the law for the first time, we might think it was a reasonable condition for the courts to enforce, that property for human occupation should be understood between the parties to be at least healthy, yet parties choose to make their own contracts- and we must leave them to that. It is safer, on the whole, and the ordinary principles applicable to other cases of *89 written contracts are just as applicable and as reasonably applicable here.
Furthermore, it may be said that great inconvenience on the other hand might arise from an attempt of the courts to introduce this principle. About as much fraud would arise in the attempts of tenants to break up the lease when they found the premises were disagreeable as when the premises were not disagreeable. It is better, therefore, that parties must make their own contracts and protect themselves. The law does not undertake to treat contracting parties as requiring nurses. We must apply here the ordinary rule which has always been understood to regulate the contracts of parties to the letting of houses, viz., that there is no implied contract or condition, that the premises shall be habitable.
The judgment of the court below is affirmed.